NO. 94-181

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

JONATHAN S. SANFORD,

    Petitioner and Appellant,

-v-

**BRANDON** OWENS, INC.

    Employer

and

STATE COMPENSATION MUTUAL
INSURANCE FUND,

    Defendant and Respondent.

FILED

NOV 22 1994

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    Workers' Compensation Court
                The Honorable Mike **McCarter,** Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Erik Rocksund, Columia Falls, Montana

        For Respondent:

        Todd Hammer, Warden, Christensen, Johnson **&** Berg,
        Kalispell, Montana

Submitted on Briefs:  September 15, 1994

Decided: November 22, 1994

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

Claimant Jonathan S. Sanford appeals the decision of the Workers' Compensation Court which disallowed his petition to set aside a full and final compromise settlement with respect to a knee injury he suffered in 1989. The Workers' Compensation Court determined there had not been a mutual mistake of fact concerning the nature and seriousness of his condition. We affirm.

The sole issue for appellate review is whether the findings and conclusions of the Workers' Compensation Court are supported by substantial credible evidence.

Jonathan S. Sanford (Sanford) sustained a knee injury in December of 1989 while working as a skidder operator for Brandon Owens, Inc. in Lincoln County, Montana. He slipped and fell backwards off a tractor he was operating, seriously injuring his right knee. At the time of the injury, his employer was insured by State Compensation Mutual Insurance Fund (State Fund). At age 17, Sanford had undergone a meniscectomy to the same knee. A meniscectomy is a removal of the meniscus covering the knee.

Sanford initially saw his family doctor, Dr. Raine, who referred him to Dr. Lawrence Iwersen, an orthopedic surgeon. On January 22, 1990, Dr. Iwersen diagnosed chondromalacia patella and prescribed physical therapy. When the knee did not respond to the physical therapy, Dr. Iwersen performed a diagnostic arthroscopy on March 13, 1990. The arthroscopy did not identify any significant abnormality other than that resulting from the prior meniscectomy. During the arthroscopy, Dr. Iwersen visually observed and manually

2

probed Sanford's posterior cruciate ligament (PCL), noting that it was "intact."

Sanford continued to experience severe knee pain and in May 1990, Dr. Iwersen prescribed a magnetic resonance image (MRI). The MRI also showed the PCL to be intact. Also in May of 1990, Sanford was seen in consultation by Dr. John Hilleboe, an associate of Dr. Iwersen, who found no laxity associated with the cruciate or lateral ligament testing as observed from the videotape of the arthroscopy, the MRI and his examination.

Sanford then went to Dr. Raine again and was referred to Dr. Michael Sousa, a Missoula orthopedic surgeon. Dr. Sousa wrote in a letter to Dr. Iwersen dated July 3, 1990:

> [T]his patient has some instability secondary to cruciate ligamentous laxity and patellar symptoms, possibly secondary to a painful bipartite patella or chondromalacia patella.

Dr. Sousa advised that Sanford follow-up with Dr. Iwersen and suggested that he might require a "cruciate ligament reconstruction and/or a partial patellectomy to relieve his symptoms." He noted that the results of this surgery were by no means 100% guaranteed.

Because Sanford's condition did not substantially improve, Dr. Iwersen did a second arthroscopy on September 11, 1990; at the same time he performed a partial patellectomy (partial removal of the kneecap) to try to lessen Sanford's pain. During this surgery, Dr. Iwersen physically probed and visually observed the PCL, noting again that it was intact. Like the first arthroscopy, this was also recorded on videotape and is part of the record in this case.

Dr. Iwersen's post-operative diagnosis is described in an

3

office note dated December 20, 1990, in which he wrote:

> The [patient] was in today, long discussion and another exam. I think that basically, <u>he has lateral and posterolateral instabilitv.</u> He has a difficult problem with this and we may be able to help him with a lateral reconstruction but I wouldn't mind getting an opinion from one of the knee surgeons in Salt Lake or Seattle as this is quite an unusual problem. He, on the other hand, would like to be rated and end all this. He has been helped with the brace and is tired with surgery, though I think we could help him with a reconstruction of his lateral collateral ligment [sic]. He does not wish this at this time, so I will rate him and see him on a PRN basis. (Emphasis supplied.)

Dr. Iwersen testified that he told Sanford in discussions occurring prior to his April 1991 settlement that he had posterolateral instability, that the problem was a difficult one, and that additional surgery was likely. He told him his knee was unstable because of damaged ligaments and recommended that Sanford seek help from a knee specialist in Salt Lake City or Seattle. Dr. Sousa agreed that a reconstruction of Sanford's knee ligament would be in his best interest.

Pursuant to the April 1991 settlement agreement with the State Fund, Sanford received a $29,000.00 lump sum payment and $10,325.73 in biweekly payments. He reserved medical and hospital benefits. He acknowledged at trial that he was aware prior to the settlement that his knee could require further surgery and that Dr. Iwersen had suggested getting another opinion from a specialist in Salt Lake City or Seattle. He further acknowledged that he had not wanted to submit to the surgery suggested by Dr. Iwersen and that he wanted to end it all and bring his claim to closure. Dr. Iwersen performed reconstructive surgery in November 1991.

4

Sanford testified that his knee condition caused his knee to "pop out" on hundreds of occasions and on a daily basis following the March 1990 arthroscopy performed by Dr. Iwersen. He testified that in January 1992, the worst instance of the knee popping out occurred as he was going down a flight of stairs in his home. Following that occasion, he told his physical therapist that he had fallen on his knee. During the trial, he minimized the degree of seriousness of the fall when he testified that he remembered it because his daughter was with him and she was hurt. At trial, he testified that he did not fall on his knee but rather had fallen with his shoulder against the paneled wall and that he was sore all over for a few days.

Sanford had further surgeries on the right knee performed by Dr. Lonnie Paulos in Salt Lake City, Utah. Dr. Paulos performed an arthroscopy on September 29, 1992, and a posterolateral knee reconstruction on January 28, 1993.

Dr. Paulos testified by deposition as to his belief that a tear in the PCL had been present but healed at the time Dr. Iwersen saw an intact PCL. Dr. Paulos did not have the benefit of viewing Dr. Iwersen's videotapes from the two arthroscopies done prior to Sanford's settlement, nor had he reviewed the depositions of Sanford and his wife, the physical therapy records, or Dr. Sousa's medical records and he did not know that Sanford had fallen down the stairs in January of 1992. Without this very pertinent information, Dr. Paulos concluded that Dr. Iwersen did not '*appreciate the instability" of Sanford's knee. Dr. Iwersen

5

testified in his deposition that he did not appreciate the instability of Sanford's knee early on in his care of Sanford but did so by the fall of 1990. This was after the second arthroscopic surgery and prior to Sanford's settlement with the State Fund.

Sanford was not represented by counsel in negotiating the April 1991 settlement agreement. In this action, he has attempted to reopen that settlement agreement based on mutual mistake of material fact. He contends that he and the State Fund were unaware that he had sustained a tear of his PCL ligament. He further contends that there was a mistake in the nature and extent of the injury and in the belief that he could return to work.

Sanford's request in this case is for a review of evidence presented mostly by medical doctors. Upon review of the entire record, this Court will uphold the Workers' Compensation Court's factual findings and conclusions if they are supported by substantial credible evidence. Simons v. State Compensation Mut. Ins. Fund (1993), 262 Mont. 438, 445, 865 P.2d 1118, 1122; Pepion v. Blackfeet Tribal Indus. (1993), 257 Mont. 485, 489, 850 P.2d 299, 302; Rose v. Burdick's Locksmith (Mont. 1994), 875 P.2d 337, 338, 51 St.Rep. 447, 448. In cases where all medical testimony is not offered by deposition, the Court will not reweigh the medical deposition testimony. Simons, 865 P.2d at 1122. In this case, most but not all of the significant medical testimony was presented by deposition and, thus, our review of the factual findings and conclusions is limited to whether the findings are supported by substantial credible evidence.

Are the findings and conclusions of the Workers' Compensation Court supported by substantial credible evidence?

The factual findings and conclusions which are being challenged in this appeal relate to the significance of the PCL injury, the effect of the pre-settlement diagnosis of lateral and posterolateral rotary instability, and whether Sanford may return to work. For the reasons discussed below, we conclude that the Workers' Compensation Court's decision refusing to set aside the settlement agreement is supported by substantial credible evidence.

## THE PCL INJURY

The evidence was undisputed that Sanford's PCL in the right knee was found to have been partially torn and healed over by scarring on September 29, 1992, the date of Dr. Paulos' first surgery. This was eight months after the fall on the stairs at home, nearly eighteen months after the settlement and close to three years after the compensable injury. The testimony conflicts as to when the tearing of the PCL may have occurred.

There is no question that Sanford sustained a very serious work-related injury when he fell from the tractor in December of 1989. Dr. Paulos opined that this must have been the time when the PCL tear occurred. Sanford relies on Dr. Paulos' opinion for his claim of mutual mistake of fact. He contends that the PCL injury resulted from the December 1989 accident although the damage was not recognized or identified until after the settlement. He further contends that the Workers' Compensation Court's findings and conclusions supporting the ultimate conclusion that the PCL damage occurred as a result of the 1992 fall were based on the

7

testimony of State Fund's expert witnesses, Drs. Sechrest an Friedrick, and are contrary to the opinions and records of Sanford's treating physicians, Drs. Iwersen and Paulos.

The Workers' Compensation Court Finding of Fact No. 27 states in pertinent part:

> e) It is more likely than not that the PCL tear identified by Dr. Paulos was caused by Sanford's January 1992 fall down the stairs at home. Both Dr. Sechrest and Dr. Friedrick reviewed videotapes of Dr. Iwersen's first two surgeries as well as a physical therapy report following Sanford's January 1992 fall. Based on their review of those items, as well as other records and depositions, they testified that it was more probable than not that the PCL damage occurred as a result of the January 1992 fall down the stairs. Prior to the fall down the stairs, claimant's knee popped out "hundreds of times." . . . The fall down the stairs, however, was different in degree. Claimant described his fall as follows:
>
>> A: That's the worst time because the knee -- the knee popped quite a ways out. It wasn't just a little. It wasn't just a slide. It was an out.
>>
>> Q: And that one really put you down?
>>
>> A: Yes.
>
> Dr. Friedrick observed videotapes of the 1990 arthroscopies and opined that Dr. Iwersen's probings of the PCL were inconsistent with the existence of a PCL tear at that time. . . . Dr. Iwersen did not express an opinion but pointed out that falling down the stairs did not cause Sanford's instability, which already existed, and that the fall could have caused a PCL tear or further tear. (Citations omitted.)

Dr. Iwersen's videotapes of the first two arthroscopies both show that Dr. Iwersen probed the PCL and concluded that it was intact. The testimony presented establishes that a finding that the PCL is "intact" does not mean it is in perfect condition and that an injured PCL is only one of a number of problems which can

8

cause a knee to be unstable. It further established that although the PCL may have been stretched and may have contributed to the laxity of the knee as a whole, that sort of condition is not as apparent soon after an injury as it is after a period of time. This is apparently because the muscles which help to support the knee, including the four quadriceps in the thigh, weaken and become atrophied from disuse. In the beginning post-injury stages, it is more difficult to detect exactly what is injured because the patient may involuntarily guard the knee by motor control due to good muscle tone, thereby shielding the exact nature of the injury from detection.

At trial, Dr. Sechrest testified in person. Dr. Sechrest had thoroughly reviewed all the medical records of all the physicians who treated Sanford; he had reviewed the depositions of Dr. Iwersen, Dr. Paulos, Dr. Friedrick, Sanford and Sanford's wife; he had reviewed the physical therapy reports; and he had seen Dr. Iwersen's videotapes.

Dr. Sechrest testified that if you have continued giving way of the knee, you may have significant instances of reinjury. He further testified that the instability may increase over a period of time and ligaments of the knee may be damaged or further damaged more easily with incidents of trauma. He testified that the PCL may not be functioning the way it should and yet still appear intact, show up on an MRI scan intact, and only over time become stretched out and unable to function properly. He testified that there was a definite possibility that the PCL was further damaged

9

when Sanford fell on the stairs and that, based on the information he reviewed in the chart, it was more likely than not that further injury occurred to the PCL at that time. Dr. Sechrest further testified that after his review of the objective data provided to him, including the report of the MRI scan, the videotapes, and the results of the examinations by three orthopedic surgeons--Drs. Sousa, Hilleboe and Iwersen--his opinion was that the PCL was intact prior to the time Sanford saw Dr. Paulos. He testified that the weakening and resultant atrophy of muscles and other connective tissues from disuse can cause a "set-up for further injury . . . [lowering] the threshold at which any connective tissue is going to be damaged" and that where the muscles are weak and atrophied, it can take an incident of less trauma to further affect the structures in the knee.

The State Fund also provided the deposition testimony of Dr. Friedrick, another orthopedic surgeon. Dr. Friedrick testified to his opinion, based on a review of all the records, that it was medically more probable than not that the PCL was torn or partially torn at some time subsequent to the settlement in April of 1991. He testified that if the PCL had been significantly disrupted, Dr. Iwersen's probing as demonstrated by the videotapes would have either lengthened or completely separated the fibers of the PCL, depending on the degree of the injury.

Sanford argues that Dr. Iwersen never diagnosed the PCL damage prior to the April 1991 settlement. Dr. Iwersen's records do not specify a problem with the PCL prior to the April 1991 settlement.

10

However, Dr. Iwersen testified that his diagnosis included the possibility of PCL damage even though it was not specifically identified. Dr. Iwersen stated that an identification of the PCL injury was not crucial to his overall diagnosis of posterolateral rotary instability. Dr. Sechrest also testified that he did not consider the identification of a particular injury to the PCL to be a determining factor. In fact, all of the medical testimony indicates that a diagnosis of PCL damage is not critical and that a functional diagnosis of lateral and posterolateral rotary instability implicitly carries with it the possibility of PCL damage.

Dr. Sechrest testified that such a functional diagnosis describes a pattern of instability in the knee based on a physical examination of the mechanics of the knee. Prom the physical reaction to certain physical maneuvers, a physician can imply injury to certain groups of ligaments. Dr. Iwersen made this functional diagnosis after his second arthroscopic surgery performed in September of 1990. All doctors agreed that the posterolateralrotary instability in this case--was the critical determining factor in determining how next to proceed. The diagnosis included the possibility of some damage to the PCL but damage in the nature of laxity rather than an outright tear which would have been observable by means of the arthroscopies.

Sanford attempted to deny that his at-home injury was serious enough to tear his PCL. His testimony at trial contradicted that

11

of his deposition.  In his deposition testimony, he testified that the incident on the stairs was the worst incidence of the knee popping out; at the trial, he claimed that he remembered the incident because his daughter was hurt.  He told his physical therapist that he had landed on his right knee; at trial, he denied falling on his knee and stated that he had hit his shoulder lightly on the paneled wall and that his entire right side was sore.

Sanford's contention that the Workers' Compensation Court disregarded the testimony of his treating physicians is not persuasive. Dr. Paulos did not have a complete foundation from which to make a conclusion.  Moreover, Dr. Paulos did acknowledge that the PCL could have torn at the time of the fall on the stairs. Dr. Iwersen also testified it was possible that the PCL could have been torn in the fall on the stairs but stated that he had no opinion on that issue.  In contrast, both Dr. Sechrest and Dr. Friedrick had reviewed all of the medical records and depositions in this case.  Furthermore, Dr. Sechrest testified in person and the Workers' Compensation Court found him to be a very credible and knowledgeable witness.  Clearly, there was substantial credible evidence to support a finding that the PCL was torn when Sanford fell on the stairs in his home.  We will not reweigh that evidence. We conclude the Workers' Compensation Court's discounting the weight attributable to Dr. Paulos' testimony is supported by substantial credible evidence.

### THE  PRE-SETTLEMENT  DIAGNOSIS

Sanford contends that the Workers' Compensation Court erred by

12

finding and concluding that the basic nature and extent of his condition was recognized even though his treating physicians may not have identified the specific ligaments involved. He contends that Dr. Iwersen admitted there was no specific reference to the PCL being damaged prior to the 1991 settlement and that the pre-settlement diagnosis did not include PCL damage.

The State Fund contends that these arguments and assertions assume that damage to the PCL was present after the original injury and prior to the settlement and did not result from Sanford's falling down the stairs in January of 1992. It further contends that this Court need not address this issue any further because it assumes that the PCL was damaged prior to the settlement.

Although we have addressed the issue of damage to the PCL at length above, this issue is not as simple as respondent would make it. The medical testimony in this case is clearly in agreement that other ligaments as well as the PCL are likely involved in an unstable knee. In fact, the evidence is emphatic that rarely is there only one ligament involved. Dr. Iwersen's diagnosis of lateral and posterolateral instability is a complex of injuries to various soft tissues in the knee and may or may not involve damage to the PCL. Moreover, it was explained at trial and in depositions that as the supporting structures become weakened and atrophy from disuse, it becomes easier to make an accurate diagnosis of the particular structures contributing to the instability.

Dr. Sechrest testified in detail during the trial concerning the concept of functional diagnosis. He explained that a diagnosis

of lateral and posterolateral rotary instability is a functional diagnosis which is generally the result of a combination of injuries. He further explained that while a specific identification of a tear in a ligament may be important in determining the plan for a specific surgical procedure, it is not significant in determining the nature and extent of the injury. Dr. Sechrest also stated that tearing or further tearing of ligaments may occur where this sort of functional diagnosis is made, particularly when the leg musculature subsequently becomes weakened and atrophied.

The deposition testimony of Dr. Friedrick and Dr. Iwersen agreed with the testimony of Dr. Sechrest concerning the nature of the diagnosis. Their testimony indicated that the PCL may have sustained some damage as a result of the 1989 injury which remained undetected initially and which contributed to the overall instability of the knee. Both Dr. Sechrest and Dr. Iwersen explained that specific reference to the PCL was unnecessary for reaching a correct assessment or diagnosis of Sanford's condition.

Dr. Iwersen explained the nature of the diagnosis of posterolateral rotary instability:

> [W]hether you have a complete tear of your posterior cruciate ligament to me doesn't -- That's not crucial. What is crucial is that he has this instability problem that is going to be disabling. It's a difficult, difficult problem to deal with. And the posterior cruciate to me just -- It doesn't mean anything. What has happened is Doctor Paulos elected to reinforce that posterior cruciate ligament in order to take care of this posterolateral instability.

Dr. Iwersen also testified that even when the PCL is intact, it may

14

be necessary to tighten or reconstruct the ligament. Prior to the settlement, he assessed Sanford's injury as a difficult one to address and encouraged a referral to an expert in Salt Lake City or Seattle. Dr. Iwersen stressed to Sanford that he would likely need additional surgery in the future and that he could possibly need a total knee replacement.

There are numerous other indications in the record to support the fact that the seriousness of the injury was recognized by Dr. Iwersen prior to the settlement in April of 1991. In an office note dated July 30, 1990, he states that "really I am unsure what's going on here." He testified that initially, he did not appreciate the nature of the injury, but certainly did so prior to the settlement. The record supports this statement. Dr. Iwersen had the written report of Dr. Sousa's evaluation in which Dr. Sousa stated that it was possible Sanford would require a cruciate ligament reconstruction and/or partial patellectomy. Indeed, Dr. Iwersen had wanted to perform another surgery and particularly advised Sanford that he had a difficult problem not easily identified. Dr. Iwersen eventually did perform a third surgery but not until several months after the settlement. Clearly the problem was identified, however, that the condition would require future surgery to take care of laxity which would occur as a natural progression. Dr. Iwersen also told Sanford that he may require a total knee replacement at some later date. Dr. Paulos also opined that a total replacement may be necessary in the future. It is hard to imagine what further extent of the effect of the injury

15

could be contemplated beyond a total knee replacement.

Dr. Sechrest testified that Dr. Iwersen had not misdiagnosed Sanford's condition and that the diagnosis made by Dr. Iwersen after the second arthroscopy was a functional diagnosis which is usually the result of a combination of injuries. Dr. Sechrest further explained that although a specific identification of a tear may be important in determining when to perform a specific surgical procedure, it was not significant in determining the nature and significance of the injury here. Dr. Paulos also agreed with the functional diagnosis of posterolateral rotary instability and did not agree with Sanford that Dr. Iwersen had misdiagnosed his condition.

Setting aside a settlement based on mutual mistake of fact requires a change in diagnosis. The diagnosis here included the possibility that Sanford could further injure the knee as a result of its condition. A diagnosis of instability involves the possibility of future damage because the condition is unstable. That possibility of future damage became reality here when Sanford further injured the knee <u>due in wart to the instability wreviouslv diaanosed</u> by <u>Dr. Iwersen</u> which caused his knee to be more susceptible to injury. Simply put, the diagnosis remained the same irrespective of a PCL injury. Further, all doctors were in agreement that it was the 1989 injury and not the fall on the stairs that caused the instability.

The alleged material mistake of fact concerning the nature and extent of the injury here is not analogous to the sort of mistake

16

which can result in a setting aside of a workers' compensation settlement such as in **Kimes v.** Charlie's Family Dining & Donut Shop **(1988),** 233 Mont. 175, 759 **P.2d** 986, where it was discovered after settlement that the claimant had suffered a torn meniscus which created the conditions for probable degenerative changes in the knee joint. <u>See also</u> Wolfe **v.** Webb **(1992),** 251Mont. 217, 824 **P.2d** 240 (claimant suffered injury to clavicle and after settlement, his physicians discovered previously undiagnosed damage to his right shoulder); Kienas v. Peterson **(1980),** 191 Mont. 325, 624 **P.2d** 1 (medical assessment of a back injury did not take into account its effect of aggravating the preexisting cerebral palsy); and Weldele v. Medley Dev. **(1987),** 227 Mont. 257, 738 **P.2d** 1281 (treating physician's initial assessment was a misdiagnosis of the actual extent of the injury).

We conclude there was no misdiagnosis of the nature and extent of the injury here which constitutes a mutual mistake of fact. The nature of the injury here was a general instability of the knee with the possible extent being a total knee replacement in the future. The diagnosis did not rule out the possibility of future surgeries to repair laxity or other problems caused by the instability of the knee falling short of a total replacement.

## RETURN TO WORK

Although Sanford **claims** he has not been able to obtain employment, we conclude the Workers' Compensation Court did not err in determining that Sanford's employment prognosis has not changed. Prior to settlement in April of 1991, Dr. Iwersen determined that

Sanford could return to sedentary employment and, most recently, Dr. Paulos has also testified that he is able to return to sedentary employment.

We hold the findings and conclusions of the Workers' Compensation Court are supported by substantial credible evidence.

Affirmed.

_____
Justice

We Concur:

_____

_____

_____

_____
Justices

18